Filed 9/22/21  In re H.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re H.W., a Person Coming Under the Juvenile Court Law. | |
| S.D. COUNTY HEALTH & HUMAN SERVICES AGENCY, | D078247 |
| Plaintiff and Respondent, | (Super. Ct. No. J519651) |
| v. | |
| E.C. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant E.C.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant B.W.

Johanna R. Shargel for Defendant and Appellant R.G.

Caitlin E. Rae, Chief Deputy County Counsel and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

E.C. (Grandmother), appeals an order denying her petition under Welfare and Institutions Code[1] section 388 for placement of minor H.W. with her rather than with foster caregivers. Grandmother contends the San Diego County Health and Human Services Agency (Agency) violated the separation of powers doctrine and her constitutional rights in denying her application for approval under the Resource Family Approval (RFA) Program (§ 16519.5, et seq.). She also contends the juvenile court erred as a matter of law in denying her section 388 petition by relying on the Agency's denial of her RFA and failing to independently review her request under section 361.3 for relative placement preference.[2]

Mother appeals the court's order terminating her parental rights and asserts the court abused its discretion in declining to apply the beneficial mother-child exception to adoption. Father joins Mother's arguments on this issue, but does not challenge the termination of his own parental rights.

The Agency contends the juvenile court lacked jurisdiction to consider Grandmother's section 388 petition requesting placement of H.W. since her

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

[2]  Mother and Father join Grandmother's arguments regarding placement. The Agency contends they do not have standing as aggrieved parties to assert this issue. Assuming, without deciding, the parents have standing to appeal the issue of placement with Grandmother, we consider their position in connection with Grandmother's claims. (See *In re K.C.* (2011) 52 Cal.4th 231, 238; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054 (*Esperanza C.*).)

2

RFA application was denied. Alternatively, the Agency contends the order should be affirmed because the court considered the placement factors under section 361.3. The Agency also contends the court properly terminated Mother and Father's parental rights.

We conclude the juvenile court had authority to consider Grandmother's section 388 petition and properly exercised its discretion to deny it. We further conclude the court properly terminated parental rights after determining Mother had not established a beneficial parent-child exception to adoption. Therefore, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Initiation of Dependency Proceedings through Disposition*[3]

"This case began in January 2018, when H.W. was just under three months old. . . . [On January 3], Mother and [Father] were at the pediatrician's office when Mother began screaming, banging on the walls and doors, yelling that Father hit her, and asking strangers to help her get away. Before staff at the clinic could intervene, Father was able to get Mother out of the office and bring the infant back for her appointment." (*H.W. I* at p. 2.)

---

[3]    On our own motion, we take judicial notice of our prior unpublished opinion in *In re H.W.*, D076973 (*H.W. I*), filed September 2, 2020, in which we affirmed an order denying Mother's section 388 petition to return H.W. to her care. (Evid. Code, § 452, subd. (d); see *Dwan v. Dixon* (1963) 216 Cal.App.2d 260, 265 ["a court may take judicial notice of the contents of its own records"]). From this earlier opinion, we draw our factual summary regarding events from H.W.'s detention through termination of parental services in December 2019. (*In re W.R.* (2018) 22 Cal.App.5th 284, 286, fn.-2 ["Citation of our prior unpublished opinion is permitted by California Rules of Court, rule 8.1115(b)(1) 'to explain the factual background of the case and not as legal authority.' [Citations.]"].)

3

The incident resulted in a referral of child abuse to Child Welfare Services (CWS).

"The following day, child protective services workers met with Father and [G]randmother. Father denied any domestic violence in his relationship with Mother, but reported that Mother had significant mental health issues, including a diagnosis of schizophrenia. [G]randmother reported that she had been the child's primary caregiver and that she was concerned about Mother's ability to care for H.W. because of her mental illness. [G]randmother told the social worker that she did not know if Mother was using drugs and that Mother was not receiving any psychiatric treatment. She also reported that Mother and Father did not have a stable living situation, and primarily stayed with her and in hotels." (*H.W. I* at pp. 2–3.)

"The following week [on January 11, 2018], law enforcement contacted the [Agency] after a violent altercation between Mother and Father in their car with H.W. in the back seat. The police report for the incident indicated the couple were fighting while Father was driving onto the freeway. Father punched Mother in the head multiple times and threatened her life before Mother jumped from the moving vehicle while it was on the on-ramp." (*H.W. I* at pp. 2–3.) Mother reportedly bit Father's thumb to protect herself. When police arrived at the scene, an officer drew his gun at Father to keep him from pursuing Mother. Mother had multiple lacerations on her head and she was missing a tooth and bleeding from the mouth. Father was arrested, Mother was taken to the hospital for her injuries, and H.W. was taken to Grandmother's home.

After Father was released from jail the night of his arrest, and despite the violent incident, Father and Mother were back together the following day. "During its investigation, the Agency discovered that both parents had

extensive criminal records and that Mother had a history of drug abuse. Mother told the Agency's social workers that she had a diagnosis of schizophrenia but was not able to take medication because she was pregnant. Mother also reported she had used methamphetamine after H.W. was born." (*H.W. I* at p. 3.)

According to the detention report, Grandmother previously observed violent behavior between Mother and Father. She said Mother provoked Father by slapping him and that Mother's mental health issues impeded her ability to care for and bond with the child. Grandmother was H.W.'s primary caregiver since birth, but the child was with the parents during the vehicle incident because Father thought having the child present would help the parents obtain hotel vouchers more easily.

"[O]n January 17, 2018, the Agency filed a petition on behalf of H.W. under section 300, subdivision (b)(1) alleging that H.W. was at risk of serious physical harm or illness as a result of the violent altercation that occurred between her parents in their car." (*H.W. I* at p. 3.) Pending the detention hearing, Father and Grandmother agreed with the social worker that the parents would have separate supervised visits in Grandmother's home. But when the social worker visited the home, Grandmother reported that Mother and Father had visited the child together. The parents again agreed to have Grandmother supervise their separate visits with H.W.

At the detention hearing, the court appointed counsel for Mother and Father, who were each present, ordered H.W. detained in the home of an approved foster family or relative, and set the jurisdiction and disposition hearing. "H.W. was [then] placed with a foster family and Mother agreed to participate in a domestic violence perpetrators group, medication management counseling, drug testing, and therapy. The Agency

recommended that the court declare H.W. a dependent of the juvenile court and that custody be removed from her parents.  At the jurisdiction and disposition hearing [on February 8, 2018], both parents set the matter for trial[.]  In its report for the trial, the Agency indicated [G]randmother was being evaluated for placement of H.W. and continued its recommendation for the court to take jurisdiction over H.W. and remove custody from her parents." (*H.W. I* at p. 4.)

"At the April 24, 2018 contested hearing, the court sustained the petition, finding the allegation true by clear and convincing evidence, removed H.W. from the parents' custody, and ordered the parents to comply with the Agency's case plan for reunification.  The court also set the six-month review hearing." (*H.W. I* at p. 4.)  Grandmother's home was cleared for supervised visits and she agreed to provide the parents with separate supervised visits.

B.    *Grandmother's RFA Application and Section 388 Petition*

Both parents and Grandmother requested that H.W. be placed with Grandmother.  In her assessment for relative placement, Grandmother provided a copy of her lease to the Agency showing she was the only person listed on the lease.  However, she admitted Mother and Father lived with her on occasion.  The social worker explained to Grandmother that if H.W. is placed with her, the parents could not be allowed to live there or it could jeopardize the child's placement.  Grandmother said she understood.

On April 25, 2018, Grandmother submitted an RFA application for approval as a resource family home.  By June 2018, Grandmother had undergone Live Scan evaluation and was planning to participate in orientation and trauma (TIPS) classes for RFA approval.  Other pending

6

items included a background assessment, building and grounds assessment with related forms, reference evaluation, and permanency assessment.

In June 2018, one of H.W.'s foster parents died unexpectedly and she was moved to a new foster placement. That placement lasted just a few days, and then H.W. was placed with her current foster family. The Agency expressed hope that Grandmother would complete the RFA requirements to place the child with her.

"However, on July 4, 2018, while H.W. was at [G]randmother's home visiting [G]randmother and other family members, both parents showed up unexpectedly. The parents and [G]randmother engaged in a physical altercation in which Mother slapped Father, Father pushed Mother, and [G]randmother choked Mother, all in H.W.'s presence. As a result of the altercation, [G]randmother was prohibited from supervising further visits and her efforts to gain placement of H.W. were set back."[4] (*H.W. I* at p. 4.) According to the Agency, Grandmother had been allowing the parents to visit together for some time, despite being informed by the Agency that the visits had to be separate. H.W.'s foster mother reported the child started sleeping better after the visits were moved from Grandmother's home back to the Family Visitation Center.

In October 2018, Grandmother filed a section 388 petition requesting that H.W. be placed with her instead of foster caregivers. She also sought de facto parent status. The Agency did not agree. In an addendum report, the Agency stated that placement of H.W. with Grandmother was "in question" because of the violent July 4 incident that occurred at Grandmother's home. That incident resulted in a referral to CWS for child abuse that was

---

[4]     We subsequently refer to this incident as the "July 4 incident."

substantiated as to Mother and Father for general neglect, and termination of Grandmother's supervision of the parents' visits.  The Agency was further concerned that it only learned of the incident several days later from the CWS referral, not from Grandmother herself.  When the social worker asked if there had been domestic violence between the parents on July 4, Grandmother said she only saw them "arguing" and thought there might have been violence before the parents entered her home.  Later, however, Grandmother said she saw Mother slap Father's face.

The Agency stated in the addendum report that it was concerned about Grandmother's ability to be honest with it, as well as the fact that Grandmother "enabled the parents' toxic relationship by allowing the mother to be present for visits and transporting the mother with the father to visits with [H.W.], even after the domestic violence incident took place on [July 4, 2018].  This create[d] great concern regarding her ability to be able to prevent the parents from being together if [H.W.] is in her care, as well as future incidents of domestic violence that are likely to happen given neither parent has made progress in their mental health services."

Grandmother's section 388 petition came on for hearing with the six-month review on October 22, 2018.  The Agency clarified that its recommendation against H.W.'s placement with Grandmother "relate[d] to today" because Grandmother's RFA evaluation was still pending.  The Agency stated that it would like to see Grandmother participate in therapy or a domestic violence program so that, "should she be approved," Grandmother could protect the child against the parents' domestic violence.  However, the Agency argued the issue of relative placement with Grandmother was not ripe for litigation because the Agency had a duty and right to complete the

8

RFA evaluation. The Agency argued that while Grandmother loves the child, she did not meet the threshold criteria to be recognized as a de facto parent.

As for Mother, "[t]hroughout the six-month review period, [she] was inconsistent both in her visitation with H.W. and her participation in reunification services." (*H.W. I* at p. 5.) Additionally, "the family's social worker reported that Mother was not regularly attending therapy or taking medication prescribed for her mental health diagnosis. Mother told the social worker that she wanted to participate in a more intensive drug treatment program and in October she tested positive for methamphetamine, cocaine, and marijuana. Despite her lack of progress, for the six-month review hearing, the Agency recommended that Mother receive another six months of reunification services." (*Ibid.*)

"H.W.'s counsel disagreed with the Agency's recommendation to continue reunification services and requested a trial on the issue of termination of services as a result of the parents' lack of progress in their reunification efforts." (*H.W. I* at p. 5.) H.W.'s counsel agreed with the Agency that Grandmother's section 388 petition was not ripe given that the RFA had not been completed and she did not meet the criteria for de facto parent status.

Grandmother's attorney argued Grandmother qualified as a de facto parent and she had demonstrated a prima facie showing on her section 388 petition. Counsel expressed concern about the time it was taking the agency to evaluate the RFA and stated that Grandmother was willing to engage in additional services to help her be a better parent.

The court denied Grandmother's request for de facto parent status, but made a prima facie finding on the section 388 petition and set the matter for an evidentiary hearing with the contested six-month review hearing.

9

In a December 2018 addendum report, the Agency stated its intent to deny Grandmother's RFA because she had not submitted or completed the necessary requirements by the deadline given to her. In January 2019, the Agency informed the court and Grandmother that it intended to deny the RFA application and Grandmother could appeal the denial through the administrative review process. The Agency suggested that the administrative appeal process should conclude before hearing Grandmother's section 388 petition. The court continued the contested modification and six-month review hearings to April 2019 and granted H.W.'s foster caregivers de facto parent status.

C.   *Termination of Parental Reunification Services*

In January 2019, "the Agency reported that Mother continued to struggle in her reunification efforts. She did not visit H.W. or participate in services regularly. Mother's parenting class facilitator reported concern that Mother had come to class under the influence of drugs. Mother also lashed out at the facilitator when she informed Mother that she had not yet completed the program. Mother visited H.W. only once and for only a few minutes because she was almost an hour late to the scheduled visit. Despite Mother's lack of progress, the Agency continued to recommend additional reunifications services." (*H.W. I* at pp. 5–6.)

"Before the contested review hearing, then set for April 2019, the Agency filed an addendum report indicating that Mother had been arrested in January for car theft, and had been released from jail in late March to an in-patient treatment facility. Mother had not seen H.W. since January 2, 2019. When she was interviewed by the Agency's social worker on April 9, 2019 about her arrest, Mother said that 'everyone was treating me like shit, so I started using drugs and was living on the streets. I stole a car so that

10

the police could pick me up.' Mother reported that since her incarceration, she had been on medication for her schizophrenia consistently and felt good. As a result of Mother's incarceration and failure to participate in reunification services, the Agency changed its position and recommended that reunification services be terminated and that the court set a permanency planning hearing for H.W. under section 366.26." (*H.W. I* at p. 6.)

On April 12, 2019, the contested modification and six-month review hearings were again continued to June 7, 2019. At that time, the Agency reported Grandmother's RFA was still pending and a final interview was scheduled with Grandmother for late April 2019. Grandmother's counsel expressed concern about how long the RFA process was taking. The court asked the Agency to provide an update on the RFA process by the next hearing. The court did not believe it could order the Agency to finish the RFA process because it was an executive function. The court commented that there were movements throughout the state to improve the RFA process and expressed hope that better efforts would be made.

Because of the delay, the contested 6-month and 12-month review hearings and Grandmother's section 388 petition were combined to June 7, 2019. (*H.W. I* at p. 7.) At the June 7 hearing, the court expressed concern about proceeding with Grandmother's section 388 petition because the Agency had not provided a relative preference analysis. The Agency thought they would have the final RFA determination within 60 days and, if not, offered to provide a relative placement analysis under section 361.3.[5] The Agency asked for another continuance of Grandmother's petition. The court

---

[5] Section 361.3 requires the Agency and the juvenile court to give preferential consideration to a request for placement by the child's family, including a grandparent. (§ 361.3, subds. (a), (c)(2).)

11

apologized for the delay, commenting that Grandmother had applied for the child's placement almost a year earlier and they had heard several times that the final assessment would be completed soon.  The court expressed concern that the "bureaucratic foot dragging on the executive level with no explanation" put "everybody in a terrible situation when we're trying to do what is best for a very small child."  The court continued the modification hearing, but proceeded with the contested review hearing for the parents.

"In its final report before the [June 7, 2019] hearing, the Agency stated that Mother continued to do well with her recovery program and had not had a positive drug test since she was released from jail.  Mother had also resumed regular visitation with H.W.  The visits were going well, although H.W. was somewhat resistant to engage with Mother.  The Agency's report applauded Mother's recent efforts to improve her life, but the Agency continued to recommend the termination of reunification services because Mother's progress was so recent.  The Agency noted that Mother had not 'demonstrate[d] the ability to stabilize her mental health long enough to be certain that [she] has the ability to safely care for' H.W."  (*H.W. I* at p. 7.)  H.W. was now a year and a half old and doing well in her foster placement and was bonded to her caregivers.

"Mother sought placement of H.W. or in the alternative additional reunification services and increased visitation. . . . Mother introduced a certificate of completion for a parenting program and other documentation concerning her progress.  She also read a letter she wrote to the court expressing remorse for her prior behavior, the steps she had taken to get her life on track, and explaining that she was dedicated to her recovery and to being a stable parent for H.W.  Counsel for the Agency and H.W. praised Mother's new-found success, but asserted that termination of reunification

services remained appropriate in light of the length of time that had passed since the proceeding was initiated. Agency counsel noted that the end of the 18-month review period was approaching on July 18, 2019, and that in order to continue services to that date, Mother would need to show a probability that H.W. could be safely returned to her care, a burden Mother could not meet." (*H.W. I* at pp. 7–8.)

Similarly, Father failed to show consistency in his domestic violence treatment over the course of the case and had very little contact with the child over the prior six months. The child, on the other hand, was thriving with the foster caregivers. H.W. was very young and at the age where the child needed permanency and consistency, which neither parent could demonstrate or provide over the life of the case. The Agency and H.W.'s counsel recommended termination of services for Father as well. Father joined in the request to place the child with Mother and sought continuation of his reunification services.

The court found the Agency met its burden by clear and convincing evidence and terminated reunification services for both parents. The "court commended Mother for her sobriety and new commitment to H.W. The court found, however, that Mother had not made sufficient progress towards mitigating the causes of H.W.'s removal from her care to warrant continued services and that it was unlikely she could regain custody of H.W. by the end of 18-month review period. The court noted that had Mother's recent progress occurred earlier in the proceeding, its findings would be different. The juvenile court stated its additional finding that Mother had not been consistent in her visitation with H.W. and that the Agency had offered

13

reasonable services to the parents." (*H.W. I* at p. 8.) The court scheduled a permanency planning hearing under section 366.26.[6]

At the conclusion of the hearing, the court expressed its "profound displeasure that the RFA process is what it is" and had not been completed yet. The court stated Grandmother, the caregivers, and H.W. deserved a decision and the continued delays were "intensely disrespectful" to Grandmother and the caregivers and were not in the child's best interests. The court also expressed concern that the "lethargy of the RFA process poses a direct threat to the due process interests of the parties involved in these cases." The court asked County Counsel to convey "in the strongest possible terms" that the court expected a decision by the next hearing.

D.   *Denial of Grandmother's RFA Application*

On July 15, 2019, nearly 15 months after Grandmother submitted her RFA application, the Agency finally notified her that it was denied. The Agency stated in its notice of action the denial was based on Grandmother's "failure to provide satisfactory evidence" that she could meet or conform to all RFA requirements, including on six separate requirements: (1) failure to meet RFA applicant/parent qualifications; (2) an adult residing in or regularly present in the home was denied a criminal record exemption or had an existing exemption rescinded due to a conviction for an exemptible crime; (3) engaging in conduct that posed a risk or threat to the health and safety, protection, or well-being of a child; (4) failure to act as a reasonable and prudent parent or failure to provide care and supervision as required; (5) failure to cooperate or comply with the application process or making false or

---

[6]   The parents' writ petitions regarding this order were dismissed after counsel notified the court that there were no viable issues for writ review. (D075992, July 16, 2019)

14

misleading statements to obtain RFA; and (6) failure to meet RFA caregiver or permanency criteria as determined in a psychosocial or risk assessment.

The Agency further explained that Grandmother had failed to demonstrate she met the resource family qualifications or that she had "the ability to provide safety, permanency, [and] protection" for the well-being of an abused or neglected child for several reasons. First, she violated county directives as a supervisor when she permitted the parents to be present with the child while they were under the influence and when they were not allowed to be together in the presence of the child. Presumably referring to the July 4 incident at Grandmother's home, the Agency stated that during this visit Father attempted to choke Mother in the child's presence. Second, Grandmother "failed to demonstrate the ability to maintain a safe, stable home environment, and maintain safe boundaries from adults who have not received a criminal clearance." The Agency stated she had provided deceptive or misleading information about the presence of uncleared adults in her home. Third, she failed to understand the serious effects of domestic violence on children by allowing Father to be present in her home in November 2018 despite knowing he engaged in domestic violence and failing to obtain a restraining order against Father. Fourth, she "failed to demonstrate an ability to provide protection and . . . [the] parenting skills or knowledge necessary to advise a child on how to keep safe boundaries." Specifically, she "fail[ed] to demonstrate rehabilitation from her own history of sexual abuse" and failed to accept that sexual abuse had occurred to another "child with whom she is intimately acquainted." Fifth, she was unable to assure financial security and stability to meet the needs of the household. Finally, the Agency stated Grandmother "failed to demonstrate rehabilitation and present good character" related to eight convictions she

15

suffered from the early 1980s through 2008. She was denied a criminal record exemption. On August 13, 2019, Grandmother appealed the Agency's denial of her RFA application and request for a criminal record exemption.[7]

E.    *Denial of Mother's Section 388 Petition for Modification*

"[O]n September 27, 2019, Mother filed a petition for modification under section 388 seeking to set aside the court's prior order terminating reunification services and setting the permanency planning hearing. As changed circumstances, Mother pointed to her completion of the treatment program at her first residential placement after being released from jail, her recent transition to sober living housing (where H.W. could also live) with continued supported services, and her eight months of sobriety and stability in the treatment of her mental health diagnosis. Mother asked the court to place H.W. with her with family maintenance services." (*H.W. I* at p. 9.)

On December 4, 2019, at the contested hearing on Mother's section 388 petition, the juvenile court denied Mother's petition for modification. "The court emphasized the fact that a full year had passed after the proceeding was initiated before Mother made any progress in her reunification efforts. The court stated that Mother's success was to be celebrated, but that her recent progress could not overcome the fact that H.W. was over two years old and had been out of the care of Mother since her second month of life. The court found that Mother's nine months of stability was praiseworthy, but not sufficient evidence of changed circumstances. Finally, the court found that even if there were changed circumstances, Mother had not shown that

_____

[7]    According to the Agency, Grandmother's administrative appeal of the RFA denial would be set for hearing a minimum of six months from when she submitted the appeal. The appeal was still pending at the time the challenged orders were made on November 18, 2020.

16

reversing its prior order terminating Mother's services was in H.W.'s best interests."[8] (*H.W. I* at p. 11.)

After denying Mother's petition, at the request of Grandmother's counsel, the court continued the hearing on Grandmother's petition for modification and set the permanency planning hearing for January 3, 2020. Over the objection of the Agency, the court at an earlier proceeding had also appointed counsel for Grandmother, determining it was in H.W.'s best interest and warranted by the "unique circumstances" of the case.

F.    *The Agency's Section 361.3 Relative Placement Assessment*

Although Grandmother's RFA was denied, the Agency conducted a relative placement assessment of her, as required under section 361.3, and provided its evaluation in an addendum report dated November 19, 2019. No other family members submitted an RFA application or requested placement of the child. In conducting the section 361.3 assessment, the social worker reviewed H.W.'s dependency case file to determine her best interest in potential relative placement; she did not rely on the RFA report or denial.

Pursuant to section 361.3, subdivisions (a)(1)–(8), the Agency considered the required factors, including: (1) the child's best interest; (2) the parent's wishes; (3) proximity of the placement so as to facilitate visitation and reunification with the parents; (4) placement of any siblings and half-siblings; (5) the good moral character of the relative; (6) the nature and duration of the relationship between the child and relative; (7) the relative's ability to provide appropriate and safe care of the child; and (8) safety of the relative's home. (§ 361.3, subds. (a)(1)–(8).)

---

[8]    As previously stated, we affirmed the order denying Mother's section 388 petition to return H.W. to her care in an unpublished opinion filed in *H.W. I* on September 2, 2020. (See fn. 3 *ante*.)

17

The Agency considered that both parents stated their wish for H.W. to be placed with Grandmother and that Grandmother had consistently expressed interest in caring for the child. Although the reunification services had been terminated, the Agency considered that Grandmother resided locally and could assist in the child's visitation with the parents. H.W. had several older paternal half-siblings, but Grandmother did not raise them or have contact with them. In considering her good moral character, Grandmother shared with the Agency that she had a substance use and criminal history, but had been sober for over a decade. Grandmother's criminal history had not been cleared. The Agency found that Grandmother was "an important member of her family, who lends her support to others in need[,]" and she has "a strong connection to her church community." The Agency had also cleared the buildings and grounds of Grandmother's home, but not the criminal history of people who frequented the residence.

The Agency considered that Grandmother was actively involved in H.W.'s life since birth and was the child's primary caregiver during her first three months of life. After H.W. was detained, Grandmother had unsupervised visits with the child and supervised the parents' visits for approximately six months. But Grandmother's extended visits and supervision of the parents were terminated because of the July 4 incident that occurred in her home with the child. The Agency noted that H.W. "happily recognizes and plays" with Grandmother.

In assessing Grandmother's ability to provide appropriate and safe care of the child, the Agency is required to evaluate Grandmother's ability to, among other things, "[p]rovide a safe, secure, and stable environment for the child" and "protect the child from his or her parents." (§ 361.3, subd. (a)(7)(A), (D).) Here, the Agency expressed concerns. It considered that

18

Grandmother had primary care of H.W. when it received referrals alleging that Mother was abusing the child due to her untreated schizophrenia and for domestic violence between the parents. After H.W. was removed, and despite agreeing to be the child's "safety network" and to supervise and keep the parents apart during their visits with H.W., Grandmother allowed the parents to visit together, resulting in the "heated and physical" July 4 incident occurring in front of the child. The Agency was concerned that Grandmother "repeatedly minimiz[ed] the violence between the parents that lead to [H.W.'s] removal." Grandmother had said "she does not believe that the protective issue necessitating [H.W.'s] removal was severe."

The Agency also considered Grandmother's own history of experiencing domestic violence. Father reported he had witnessed domestic violence between Grandmother and his step-father. Grandmother "stated that she witnessed her mother beat up her step-father after [Grandmother] informed her mother that her step-father was abusing her." The Agency observed that "[t]his case in particular is filled with well-meaning people who love [H.W.], yet suffer from significant generational trauma including loss, domestic violence, mental illness, and substance use, which has impeded the adults in [H.W.'s] family to be able to care for her." In addition to concerns of Grandmother's physical ability to care for a young child, these factors led the Agency to recommend against placing H.W. with Grandmother.

G.     *Contested Hearings on Grandmother's Section 388 Petition*[9] *and 366.26 Permanency Planning*

On June 26, 2020, the court began the contested hearing on Grandmother's section 388 petition, with the contested 366.26 hearing trailing. The hearings continued over several days, were conducted remotely by video due to the COVID-19 pandemic, and concluded on November 18, 2020. The court heard testimony from the social worker, the RFA worker who evaluated Grandmother's RFA application, Grandmother, and one of H.W.'s foster caregivers.

1.     *Social Worker*

The social worker testified regarding the Agency's analysis of relative placement preference and permanency planning for H.W., including the contents of her sections 366.26 and 361.3 reports, which the court received into evidence. Since we have summarized these reports in detail *ante*, we do not repeat the social worker's testimony about their content here.

The social worker testified that Grandmother had been visiting with H.W. throughout the case and had been offered two to three supervised visits each week. However, Grandmother missed "many visits" and, as a result, the Family Visitation Center terminated and reinstated her visits for "no shows or late visits" approximately three times. The social worker was present for approximately 10 visits and Grandmother appeared loving and caring toward the child during visits. H.W. enjoyed seeing Grandmother and engaged with her without sign of fear. H.W. showed "emotional behavioral trauma," including some nightmares and difficulty with transitions. According to her

---

9     In November 2019, after counsel was appointed, Grandmother filed a revised section 388 petition to place H.W. with her and set forth why she believed she met the preferred relative placement factors of section 361.3.

foster caregivers, H.W. would experience insomnia or nightmares after some visits with Grandmother and the child was referred for therapy.

As stated in the section 361.3 report, the Agency had some concerns regarding Grandmother's physical ability to care for a young child. The social worker testified she believed "it would be very difficult" for Grandmother to run after the child if she ran away in an open space. She had observed Grandmother almost fall when she tried to run after H.W. at a birthday event for the child. As to the Agency's concern that Grandmother failed to appreciate the effects of domestic violence on a child, the social worker testified that Grandmother referred to the parents' domestic violence that brought H.W. into protective services as "not that big of a deal."

The social worker testified she has observed approximately 10 or more of Mother's visits with H.W. The child is excited to see Mother "[m]ost of the time" and their interactions are "loving," with H.W. calling her "Mama." Mother's examination of the social worker was very brief. In the section 366.26 report, the social worker opined that neither parent had a parental relationship with H.W.

The social worker testified she had no concerns about the care the child was receiving from the caregivers, whom the child called "Mom" and "Dada." H.W. had been with the caregivers for two years and the social worker believed it would be harmful for the child to be removed from their care after that length of time. She opined that "it would be very difficult for [H.W.] to transition into a new home after the two years," particularly given the work that had been done for the child's trauma and attachment. In an addendum report dated October 22, 2020, which the court received into evidence, the Agency "recognize[d] that [Grandmother] loves [H.W.] deeply, [but it]

continues to recommend that [H.W.] should be given permanence, stability, and protection through adoption with her current caregivers."

2. *RFA Worker*

The RFA worker testified to the Agency's evaluation of Grandmother's RFA application and denial. The court also received the Agency's notice of action setting forth its reasons for the denial (discussed *ante*) into evidence.[10]

The RFA worker acknowledged the Agency's evaluation of Grandmother's RFA application took about 15 months to complete and explained the process takes longer in a case where the Agency has determined it to be "a denial." In Grandmother's case, the RFA worker determined her application would be denied after she completed the "family assessment." The family assessment includes evaluation of "any domestic violence history, any substance abuse, mental and physical health" of "[p]rimarily both individuals that reside in the home and who are also regularly present in the home." Any individual who "frequent[s]" the home is required to clear a background check in order for the Agency to "make sure [the home] is safe for the child."

Although the Agency initially granted Grandmother a criminal records exemption and approved her background assessment in late August 2018, it withdrew the approval because a family assessment had not been done. The RFA worker explained the Agency "didn't have a choice" in withdrawing its approval of Grandmother's background assessment because Grandmother

---

10 Previously, the court and counsel discussed whether and to what extent RFA records should be admitted for consideration of Grandmother's section 388 petition if she intended to challenge the RFA process on constitutional grounds. Over the Agency's objection, and after an in camera review of the documents, the court allowed certain confidential documents to be disclosed to minor's counsel, including the notice of action.

22

continually made "inconsistent statements" and "wasn't forthcoming or honest" about who was "regularly" in her home. Grandmother was initially forthcoming in disclosing who was in her home, but when the RFA worker told her that those persons would need to pass their own criminal background check, "the story would change to 'oh, no. They aren't here anymore.' "

An individual identified by Grandmother as her "fiancé," and later as a friend, failed to pass the criminal background check. One of Grandmother's other children had a criminal history and was not willing to complete a Live Scan evaluation. Although Grandmother said she would restrict these individuals from her home, the RFA worker testified the "fiancé" was in the home when she happened to call Grandmother on the phone, after Grandmother had said he no longer spent time there.

The RFA worker testified the Agency did not deny Grandmother's RFA application "solely" on the basis of her criminal record. The Agency was not only concerned with her "lack of transparency," but it also could not approve her home without clearing the background checks of individuals who frequented her home. The Agency also determined Grandmother "didn't demonstrate an ability to show that she understood the effects of domestic violence and the trauma that a child is going to go through from domestic violence incidents." This was in significant part due to the violent July 4 incident that occurred at her home. The Agency also had concerns about how Grandmother would respond to a child that reported sexual abuse, based on her answers regarding a prior, though unfounded, CWS referral. The Agency perceived from Grandmother's history that she had been through "a lot of trauma, [and] significant traumatic experiences," showed a lack of judgment and good moral character.

23

3. *Grandmother*

Grandmother testified that she wanted the child placed with her or with a family member. H.W. lived with Grandmother before the child was removed from the parents. Grandmother denied the parents lived in the home at the time.

Grandmother testified she never really saw the parents fight and only saw one instance of domestic violence between the parents, when Mother slapped Father across the face. She thought she could protect the child by not allowing the parents in the home if they were arguing, and she said she would call the police to intervene if she thought the parents were under the influence or experiencing a mental health episode.

Grandmother was aware of the January 2018 incident when officers brought H.W. to her, after Father and Mother had a violent fight in a moving car with the child, but she did not witness the incident. She was aware that Father went to jail and that Mother went to the hospital, but commented that Mother did not have any scars from the incident.

Regarding the July 4 incident, Grandmother testified that Mother was upset when she came to Grandmother's home. Mother's hand was bleeding, but Mother said she injured herself when she tried to stab Father. Mother told Grandmother that Father had her purse, which contained money for the baby. So Grandmother called Father and told him to come to the home with the purse. Father came to the home and when a minor relative opened the door, Father pushed his way in and pushed the minor aside. He walked over to Mother saying, "Why are you acting like that?" Mother slapped Father across the face. Grandmother jumped up to intervene and put her hand on both parents. She told them to leave because they could not argue in front of

the child.  Grandmother was aware of the safety plan for Mother and Father not to visit the child together.

Grandmother testified she was forthcoming with the Agency about her criminal past.  She was last convicted in 2008 for petty theft and had been sober for almost 20 years.  Grandmother initially denied having eight criminal convictions, but later said if they were all counted it might be more than that.  She testified that after her mother died, and not having any siblings, she got involved "in all kinds of domestic violence relationships" and started using drugs and stealing things.  Grandmother acknowledged her past, but explained "that's not the woman sitting here today."[11]

Grandmother wanted the child placed with her because she could provide everything the child needed or wanted.  Grandmother expressed concern that H.W. should know her culture as an African-American.  She did not think the caregivers knew how to care for the child's hair.  Grandmother has family members who would help if the child were placed with her.  Grandmother testified that the child knows the mother.  On an occasion when Mother was holding the child, H.W. told one of the caregivers, "This is Mommy."

---

[11]    Under cross-examination by the Agency's counsel, however, Grandmother testified the only domestic violence she had in her life was what she witnessed between her mother and step-father, but she "didn't really have too many domestic violence in [her own] relationships."  In rebuttal, the RFA worker testified that Grandmother had 17 convictions, including crimes other than petty theft, and Grandmother had disclosed that her prior relationships involved physical violence and emotional abuse, drug abuse, and some forced prostitution.  This was inconsistent with Grandmother's trial testimony that she did not stay in abusive relationships.

Grandmother agreed she had some conflicts with the foster caregivers, but stated she understood H.W. was bonded with them and would allow them to visit the child if H.W. were placed with her.

4.     *Foster Caregiver*

One of H.W.'s foster caregivers (foster father) testified. H.W. was seven months old when she was placed with the foster caregivers in June 2018. The child was initially very stoic with a flat affect. She did not smile or make facial expressions, was not active, but would not sleep more than 20 minutes at a time. At the time of the hearing, H.W. had been in the foster caregivers' care for over two years. H.W. is now a joyful, sweet, and fun-loving child who smiles all the time and likes to play, laugh, and dance. The foster caregivers want to adopt H.W. and are open to maintaining a relationship with the child's family.

The child participated in therapy due to nightmares and to improve her ability to sleep through the night. The foster caregivers spent a lot of time carrying, rocking, and helping the child become calm and comfortable. The issue resolved for some time, but it was not uncommon at the time of the hearing for the child to wake up four to five times a week screaming, unable to verbalize what was scaring her. The foster caregivers would pick up and reassure H.W. by turning lights on, walking around the house, and showing the child the other foster parent. The child was doing better after restarting therapy. The child had a couple of in-person visits with Grandmother in October 2020. After the last visit, the child would not go to sleep or would wake up 15 to 20 minutes after falling asleep. The foster caregivers were up most of the night comforting H.W. so the child could sleep.

5.  *Juvenile Court Ruling*

After careful review of the evidence, the juvenile court determined it was in H.W.'s best interest to remain with the foster caregivers and denied Grandmother's section 388 petition to change H.W.'s placement. The court also found by clear and convincing evidence that H.W. was both specifically and generally adoptable and no exception existed to overcome the legislative preference for adoption. Accordingly, the court terminated parental rights and freed H.W. for adoption.

The court acknowledged that Grandmother loves H.W. and found that she has "overcome a great deal in her life" and "is not the person now that she was 20 years ago." She has rehabilitated from her criminal and substance abuse history, and is now "an involved and loyal grandmother and active member of her church and clean and sober for more than 10 years." The court also acknowledged the foster caregivers love H.W. and H.W. "is deeply bonded to them." It found that "[t]he unsmiling seven-month-old who came to them in 2018 is now a joyful little girl who plays soccer, does arts and crafts, . . . swims and reads, and loves animals and cooking." The court concluded that "[i]t would be devastating to [H.W.] to remove her from their consistent, warm, and loving care."

The court also provided "a word about the RFA process and the criteria for assessing family placement." The court expressed frustration about the "lethargy, rigidity, and counter[ ] productiveness of the RFA process." It criticized that "any aspect of the placement analysis is painted by a category labeled 'moral character,' " which, in the court's view, asks social workers to "opine on a person's goodness or badness" and "invites disparagement and harsh judgmental terms." After offering these criticisms of the RFA process,

27

however, the court did not rely on the RFA process or the denial to reach its rulings.

The court denied Grandmother's section 388 petition because, while she demonstrated that she had taken some courses related to safe parenting and she had pursued an RFA, she failed to demonstrate a change of circumstances. The court stated: "[T]he problem is that the most important circumstance necessitating [H.W.'s] removal . . . has not changed. [Grandmother] is still unable to recognize the threat to [H.W.] posed by the violence and the relationship between [Father and Mother]. [¶] While the problems with [Grandmother] missing or being late to visits do raise some concerns, and while the extended family in and out of her house do present some concerns, the most salient issue in this case is whether [Grandmother] can be protective. She can't. *This simple salient fact that she can't weighs most heavily in the Court's analysis.*" (Italics added.)

The court concluded that Grandmother cannot be protective of H.W. based on her consistent minimization of the domestic violence between the parents and the harm it poses to the child. The court specifically considered Grandmother's opinion that the domestic violence that had occurred in the car with H.W. in January 2018, which led to her removal, was "not serious." It also found the July 4 incident concerning, and not only because of the physical violence that had occurred. The court noted that Grandmother's response to Mother having just tried to stab Father was to call Father to the home where the child was present, contrary to her agreement to keep the parents apart for the safety of the child.

Further still, the court found that Grandmother failed to recognize that Mother has untreated mental health issues and both parents have untreated substance abuse problems, in addition to issues with domestic violence. The

28

court found that Grandmother "somewhere along the way . . . lost her ability to distinguish between what is dangerous and what is not," in part "probably due to her own trauma history." It found that Grandmother "unfortunately demonstrated no insight into the fact that [Father and Mother's] violent relationship puts [H.W.] at risk. And if [Grandmother] were to have placement of [the child], it's not realistic [for the court] to assume she would keep [H.W.] from her parents." The court ultimately determined it "cannot safely place [H.W.] in her care."

For all these reasons, the court ruled that "[e]ven if the [c]ourt found changed circumstances or even if the RFA process had gone in [Grandmother's] favor," the court would not find it in H.W.'s best interests to remove her from the foster caregivers and place her with Grandmother. It thus denied the section 388 petition.

Turning to selection and implementation of the best permanent plan for H.W., the court found it uncontroverted that the child was generally and specifically adoptable by clear and convincing evidence. The court then determined that neither parent demonstrated that termination of parental rights would be detrimental to H.W. The court found neither parent had visited consistently and regularly and that while H.W. recognizes Mother as her mother and enjoys their time together, the incidental benefit to the child did not outweigh the legislative preference for adoption. Accordingly, the court terminated parental rights and designated foster caregivers as prospective adoptive parents.

DISCUSSION

## I.

### *The Juvenile Court Did Not Err in Considering and Denying Grandmother's Section 388 Petition*

Grandmother contends the Agency violated the separation of powers doctrine by using the RFA process to circumvent the Legislative preference for relative placement and to render the juvenile court authority ineffective by delaying a decision on her RFA application for over a year and "arbitrarily" denying her application and criminal record exemption based on her criminal history. As a result, she argues, her "constitutional rights to equal protections of the laws and familial association under the 14th Amendment of the United States Constitution have been violated." Grandmother further contends "the juvenile court should have used its independent judgment to order the Agency to reevaluate the [RFA application] and should have expressly found that the Agency abused its discretion in denying" it. Grandmother then argues the court's decision on her section 388 petition was therefore "based on an error of law and should be reversed."

The Agency responds that the juvenile court lacked "jurisdiction" to hold a hearing on Grandmother's section 388 petition since her RFA application had been denied and her administrative appeal of that decision was pending. The Agency argues the approval or denial of an RFA applicant is "a core executive function of the child welfare agency" (*In re Charlotte C.* (2019) 33 Cal.App.5th 404, 429 (*Charlotte C.*)) and Grandmother's remedy is to pursue an administrative appeal and, if unsuccessful, then judicial review in the superior court pursuant to Code of Civil Procedure section 1094.5. The Agency therefore argues we should dismiss Grandmother's appeal.

30

We consider the Agency's position on the court's authority before turning to Grandmother's contentions regarding the court's ruling on the section 388 petition.

A.    *The Juvenile Court Had Authority to Consider the Section 388 Petition*

We independently review purely legal questions of jurisdiction and whether a court has authority to perform a certain act.  (*Esperanza C., supra,* 165 Cal.App.4th at p. 1058.)  We begin with an overview of the relevant statutes.

1.    *Relevant Statutes*

When a child is removed from a parent under section 361, section 361.2, subdivision (e) provides a range of options for the juvenile court to consider for placement of the child.  These options include the "approved home" of a relative (or a relative assessed for emergency placement and pending RFA approval), a nonrelative extended family member, a resource family as defined by the RFA statute, or a home pending RFA approval if there is a compelling need for placement based on the needs of the child.  (§ 361.2, subds. (e)(1)–(4).)

The RFA program was implemented statewide in January 2017 to provide "a unified approval process to replace the multiple processes to approve foster care homes, relatives and nonrelative extended family members, and adoptive homes for the placement of dependent children."  (*Charlotte C., supra,* 33 Cal.App.5th at p. 408; §§ 16519, 16519.5.)  Among numerous other duties, section 16519.5 charges county social services agencies with "[a]pproving or denying resource family applications, including preparing a written report that evaluates an applicant's capacity to foster, adopt, and provide legal guardianship of a child based on all of the information gathered through the resource family application and assessment processes" and "[g]ranting, denying, or rescinding criminal record

exemptions." (§ 16519.5, subds. (g)(5)(A)(i) and (v).) To obtain approval as a resource family, the applicant must successfully meet "both the home environment assessment standards and the permanency assessment criteria necessary for providing care for a child." (*Charlotte C.,* at p. 416, citing § 16519.5, subd. (c)(1).)

"There is no fundamental right to approval as a resource family." (§ 16519.5, subd. (c)(3).) "A resource family shall be considered eligible to provide foster care for children in out-of-home placement and approved for adoption and guardianship." (*Id.* at subd. (c)(4)(A).) But "[a]pproval of a resource family does not guarantee an initial, continued, or adoptive placement of a child with a resource family or with a relative or nonrelative extended family member. Approval of a resource family does not guarantee the establishment of a legal guardianship of a child with a resource family." (*Id.* at subd. (c)(6).)

Unfortunately, the assessments required under the RFA process have proven to be time consuming, resulting in extensive delays to approve homes for placement in recent years.[12] As the juvenile court in this case noted, the

---

[12] "According to a survey of 44 California counties in December [2017], only 26 percent of RFA applications in those counties had been approved. Nineteen percent of applications had been withdrawn and 54 percent, or 8,831 families, were still waiting for approval." (Loudenback, "California bills target lengthy foster-parent approval process," <https://www.dailynews.com/2018/03/07/california-bills-target-lengthy-foster-parent-approval-process/> [As of Sept. 22, 2021], archived at <https://perma.cc/X9M8-E6Z6>.) "As of November 2018, nearly 55 percent of open RFA applications for caregivers with placements prior to approval had been processing for greater than 90 days, which [was] slightly down from over 58 percent in June of 2018." (Legis. Analyst., The 2019–20 Budget: Analysis of the Department of Social Services Budget, Feb. 22, 2019, p. 36.)

"lethargy" of the process threatens to undermine the rights of the parties in dependency proceedings where statutory timelines and procedures "seek to balance competing values: protecting children from harm, preserving family ties, and avoiding unnecessary intrusion into family life." (*In re R.T.* (2017) 3 Cal.5th 622, 638.)

Separate and apart from the RFA process, there is a clear Legislative preference for placement of dependent children with a relative, if the home is appropriate, and the placement is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320 (*Stephanie M.*).) Section 361.3, subdivision (a) requires that "preferential consideration be given to a request by a relative of the child for placement of the child with the relative[.]" The statute defines "preferential consideration" to mean "that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) "The intent of the Legislature is 'that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child.' " (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 719 (*Isabella G.*).) "The relative placement preference under section 361.3 applies throughout the reunification period. [Citation.] In addition, section 361.3 applies after the reunification period where the relative has made a timely request for placement during the reunification period and the child welfare agency has not met its statutory obligations to consider and investigate the relative seeking placement." (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 595.)

To determine whether placement with the relative is appropriate, both "the county social worker and the court" must consider the placement factors listed in section 361.3, subdivisions (a)(1) through (8), which include the best interests of the child, the parent's wishes, placement of siblings and half

33

siblings in the same home, the "good moral character of the relative and any other adult living in the home" including criminal history, the nature and duration of the relationship between the child and the relative, and the safety of the relative's home. (*Isabella G., supra,* 246 Cal.App.4th at p. 719, fn. 9.) The Agency's assessment of the relative is "subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*Stephanie M., supra,* 7 Cal.4th at p. 320; *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033 (*Cesar V.*) [juvenile court exercises its independent judgment concerning the relative's request for placement].)

Here, Grandmother used the procedural vehicle of section 388 to request a change of H.W.'s placement and to place the child in her care. Section 388 provides, in pertinent part: "Any . . . person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall be verified and, if made by a person other than the child . . . shall state the petitioner's relationship to or interest in the child or the nonminor dependent and shall set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction." (§ 388, subd. (a).)

Courts have described section 388 as an "escape mechanism" for parties and interested individuals to seek modification of a juvenile court order before termination of parental rights. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).) "Such a motion may be brought pursuant to section 388 at any time after the minor has been declared a dependent child of the juvenile

34

court." (*Stephanie M., supra*, 7 Cal.4th at p. 317; see also *Marilyn H.,* at p. 309 ["This procedure provides notice to the parties and an opportunity for hearing if the statutory requirements are met."].)

A party bringing a petition pursuant to section 388 "has the burden of showing, by a preponderance of the evidence, that (1) there is a change of circumstances or new evidence, and (2) the proposed change is in the child's best interests." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 257, citing § 388.) "A petition for modification must be liberally construed in favor of its sufficiency" (Cal. Rules of Court, rule 5.570(a)) and does not need to establish a probability of prevailing (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432). The petitioner "need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 310; see *In re Jasmon O.* (1994) 8 Cal.4th 398, 415 (*Jasmon O.*) [A juvenile court must order a hearing " 'if the petition presents any evidence that a hearing would promote the best interests of the child.' "].) We review the juvenile court's decision whether to grant an evidentiary hearing for an abuse of discretion. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1158.)

2.      *Analysis*

Contrary to the Agency's contention, the juvenile court has authority to, and indeed must, consider a section 388 petition filed by a "person having an interest in a child who is a dependent child of the juvenile court." (§ 388.) Where, as here, a relative seeks placement of a dependent child by way of a section 388 petition, the juvenile court has an independent responsibility to determine whether placement with that relative is appropriate, pursuant to section 361.3. (§ 361.3; *Isabella G., supra,* 246 Cal.App.4th at p. 719 ["the juvenile court must . . . exercise its independent judgment concerning the relative's request for placement"]; *Cesar V., supra,* 91 Cal.App.4th at p. 1033.)

35

In its current form, section 361.2 limits the juvenile court's discretion to place a child in a relative's home only if the home is *approved* by the Agency. (§ 361.2, subd. (e).) As we have stated, the approval or denial of a resource family is an executive function and is typically subject to administrative review. (*Charlotte C., supra,* 33 Cal.App.5th at p. 429; § 10950 et seq.; Gov. Code, § 11500 et seq; Code Civ. Proc., § 1094.5.) However, the Agency's decision regarding approval or disapproval is not necessarily immune from judicial review in the context of a dependency proceeding. (See *Charlotte C.,* at p. 429, fn. 16; *Esperanza C., supra,* 165 Cal.App.4th at p. 1049.)

As we explained in *Esperanza C.,* the focus of the administrative process is to protect the rights of an applicant, while the focus of the juvenile court is the best interest of the child. (*Esperanza C., supra*, 165 Cal.App.4th at p. 1060.) "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of the child's circumstances when making decisions regarding the child." (*In re Chantal S.* (1996) 13 Cal.4th 196, 201 (*Chantal S.*).) Further, as the Agency acknowledged in *Esperanza C.*, "administrative remedies do not generally provide effective relief within the context of a child's dependency case due to mandatory timelines imposed by the Legislature on dependency proceedings." (*Esperanza C.,* at p. 1058.) Thus, there is a tension created by these differing interests and timelines that could ultimately force the juvenile court, in its role as *parens patriae*, to place, or continue placement of, a dependent child with a non-relative, even if the court believes such placement was not in the child's best interest.[13] (See *Chantal S.,* at p. 201.)

---

[13] Pending legislation may eventually address these concerns. Senate Bill No. 354 proposes, in part, to amend section 361.2 by adding a new subdivision (e)(11) authorizing the juvenile court to order placement of a child

Cognizant of those concerns, and its own independent responsibility to consider placement with a relative pursuant to section 361.3, the juvenile court found Grandmother had satisfied the relatively low burden of making a prima facie showing on the 388 petition and that an evidentiary hearing was appropriate. The Agency contends the court did not have "jurisdiction" to hold a hearing on the section 388 petition. To the contrary, Grandmother had standing to bring the section 388 petition as a "person having an interest in a child who is a dependent child of the juvenile court," and, having filed the petition with the juvenile court, the court had no choice but to make a ruling on it. (§ 388, subd. (a).)

The Agency's contention is not properly characterized as a question of jurisdiction over the section 388 petition. Instead, the Agency's contention derives from its assertion that the juvenile court did not have authority to review its denial of the RFA because the RFA process is a licensing function of the executive branch. However, the juvenile court did not do that here. Instead, the court was careful to conclude, "*even if the RFA process had gone in [Grandmother's] favor*, for the reasons stated above, the Court would not find that [it is] in [the child's] best interest to remove her from [her caregivers] and place her with [Grandmother]." As a result, we need not, and

---

in "[t]he home of a relative in which the juvenile court has authorized placement, regardless of the status of any criminal record exemption or resource family approval, if the court has found that the placement does not pose a risk to the health and safety of the child." (Leg. Counsel's Dig., Sen. Bill No. 354 (2021–2022 Reg. Sess.), § 8; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 354 (2021–2022 Reg. Sess.) Apr. 23, 2021, p. 12.) The bill was submitted to the Governor on September 15, 2021.

expressly do not, reach the issue of whether the juvenile court had the authority to independently review the denial of the RFA by the Agency.

To the extent the Agency contends the juvenile court abused its discretion by ordering the evidentiary hearing in the first instance, we disagree. As the juvenile court noted, a prima facie showing is a relatively low burden; the juvenile court must construe the petition liberally and order a hearing " 'if the petition presents any evidence that a hearing would promote the best interests of the child.' " (*Jasmon O., supra,* 8 Cal.4th at p. 415.) Here, the juvenile court acknowledged "the elephant . . . in the room is the requested relief that [Grandmother] is asking for would be an illegal order" because "it appears as though with the RFA denial, there is no legal mechanism for [H.W.] to be placed in [Grandmother's] home." However, the court also noted this was an unusual case and that it did not want to make any mistakes. Therefore, in an abundance of caution, the court decided Grandmother should have an opportunity to bring contrary information to the court's attention and ordered the evidentiary hearing. We find no abuse of discretion in that decision.

B.      *The Juvenile Court Properly Denied the Section 388 Petition*

We turn next to the juvenile court's ruling denying the section 388 petition, which we also review for an abuse of discretion. (*Stephanie M., supra*, 7 Cal.4th at p. 318; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) We will not disturb such orders unless the court exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. Further, when two or more inferences can reasonably be deduced from the facts, we will not reweigh the evidence or substitute our decision for that of the juvenile court. (*Stephanie M.,* at pp. 318–319.)

On appeal, Grandmother contends the juvenile court did not properly consider the relative placement factors under section 361.3 in its analysis. We disagree. The record shows the juvenile court was aware of its obligation to consider the relative preference factors. Even when the Agency advised the court that it intended to deny the RFA, the court expressed concern that the Agency had not presented a relative preference analysis. The Agency thereafter prepared and submitted the analysis in an addendum report, which report the court admitted into evidence, and the social worker testified regarding the analysis.

It is evident the court considered the section 361.3 factors. The court went so far as to criticize that "any aspect of the placement analysis is painted by a category labeled 'moral character.' " Nevertheless, the court considered and commended Grandmother for her rehabilitation and sobriety of over a decade. The court also considered the relationship of Grandmother with H.W. and Grandmother's sincere desire to care for the child.

The court's primary concern in the relative placement analysis, however, was that Grandmother could not be a safe and protective caregiver given her consistent minimization of the domestic violence between the parents and the harm it posed to the child. As the juvenile court said: "This simple salient fact that she can't [protect H.W.] weigh[ed] most heavily in the [c]ourt's analysis." Thus, the court determined that even if the RFA had been approved and circumstances had changed, the court could not safely place H.W. with Grandmother and such placement would not be in the best interests of the child. (*Stephanie M., supra*, 7 Cal.4th at p. 320.) Our review of the record reveals overwhelming evidence to support the juvenile court's conclusion. We find no abuse of discretion in the juvenile court's determination to deny the section 388 petition.

Given this conclusion we decline to reach Grandmother's broad challenges, including constitutional arguments, to the RFA process. We need not consider alternative grounds where "one good reason is sufficient to sustain the order from which the appeal was taken." (*Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 513.) This is particularly true for constitutional issues because courts should adhere to a policy of judicial self-restraint and not decide constitutional questions if a "judgment can be upheld on alternative, non-constitutional grounds." (*California Teachers Assn. v. Board of Trustees* (1977) 70 Cal.App.3d 431, 442.)

## II.

*The Juvenile Court Did Not Err in Terminating Mother's Parental Rights*

Mother contends the court erred in declining to apply the beneficial parent-child exception to adoption and terminating her parental rights. Father joins Mother's argument and further contends that if her rights are reinstated, his should be reinstated as well.

At a section 366.26 hearing, the focus of the dependency process changes from reunification services to the children's needs for permanency and stability. " 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52–53.) "Indeed, when the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)

40

The court has three permanency options at the section 366.26 hearing: adoption, legal guardianship, or long-term foster care. (§ 366.26, subd. (b).) Of these options, "[a]doption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Adoption "requires terminating the natural parents' legal rights to the child," while legal guardianship or foster care leaves parental rights in place. (*Id.* at p. 574.)

"[W]hen a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. (See § 366.26, subd. (c)(1)(B)(i); Evid. Code, § 115.) The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child. While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629–630.)

For the first element, the parents must show that they maintained "regular visitation and contact with the child[ren]." (§ 366.26, subd. (c)(1)(B)(i).) For the second element, a parent must show that "the child

41

would benefit from continuing the relationship." (*Ibid.*; *Caden C., supra*, 11 Cal.5th at p, 636 ["the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"].) Attachment or bonding between the parent and child is the central focus in the second element, although "[a]gain here, the focus is the child." (*Caden C.* at p. 632.) To determine the strength of the bond, the court may rely on evidence from "[s]ocial workers, interim caretakers and health professionals [who] . . . have observed the parent and child interact and provided information to the court." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Factors to consider include "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction[s] between parent and child, and the child's particular needs." (*Id.* at p. 576.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.,* at p. 632.)

The third element—whether termination of parental rights would be detrimental to the child—is the most difficult question for the juvenile court to resolve. Where the court has found that regular contact and visitation have continued, and that this contact has created a relationship that benefits the child, the court must "decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 632, citing *Autumn H., supra*, 27 Cal.App.4th at p. 575.) The California Supreme Court recently referred to this as "a subtle enterprise," explaining that " 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Caden*

*C.*, at p. 634, quoting *Autumn H.*, at p. 575.) "What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, at p. 633.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

In this case, the juvenile court considered and rejected the beneficial parent-child exception to adoption. As to the first element, the court found that neither Mother nor Father visited H.W. consistently and regularly. In her opening brief, Mother admits she was late for visits and missed visits on many occasions, including when she was incarcerated or in treatment. As to the second element, the court determined that H.W. recognizes Mother and enjoys the time they spend together. However, the court determined that "any incidental benefit to the child is not enough to outweigh the legislative preference for adoption" and this was not such an extraordinary case that preservation of Mother's rights should prevail over the preference for adoption.

Even where a parent has consistently visited a detained child, the parent-child exception does not apply when the parent occupies only a pleasant place, but not a parental role in the child's life. (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) "A parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child[.] The relationship arises from day-to-day interaction, companionship and shared experiences.' [Citation.] The parent must show he or she

43

occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) "A friendly relationship . . . 'is simply not enough to outweigh the sense of security and belonging an adoptive home would provide.' " (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.)

In the case of *In re J.C.* (2014) 226 Cal.App.4th 503, a young child had been in her foster caregiver's home for two and one-half years since shortly after her birth, which was the "only loving, safe, and stable home" she had ever known. (*Id.* at p. 528.) The appellate court concluded that the juvenile court did not abuse its discretion by finding the beneficial parent-child relationship exception did not apply to preclude the child's permanent plan of adoption. The court explained the mother "at best, established she had pleasant contacts with a [toddler] for whom she never provided primary care, and with whom she barely progressed to unmonitored contact." (*Id.* at p. 532.)

Like the mother in *In re J.C.*, Mother has never provided primary care for H.W. and has, at best, pleasant and positive contacts with the child during supervised visits. At other times, H.W. was reluctant to go to Mother and she had some nightmares after visitation days. Notably, Mother has never progressed beyond supervised visitation. The fact that H.W. refers to Mother as "Mama" or "Mommy" is not enough to demonstrate the substantial, positive, emotional attachment contemplated by the statute. Mother has failed to meet her burden of establishing the elements necessary for a beneficial parent-child exception to adoption.

The court did not abuse its discretion by concluding that any benefits in maintaining Mother's relationship with the child did not outweigh the benefits to the child of placement in a new adoptive home. H.W. had been

44

with her foster caregivers for two years, the majority of her short life, and she was thriving in their care.

## DISPOSITION

The November 18, 2020 order is affirmed.

DO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.